GEORGE G. MGDESYAN (SBN 225476)
MGDESYAN LAW FIRM
15260 Ventura Boulevard, PH2200
Sherman Oaks, CA 91403
Tel: (818) 386-6777
Fax: (818) 754-6778
Email: George@attorneys4law.com

Attorney for Karen Pogosian

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KAREN POGOSIAN,<br><br>Defendant. | Case No.: CR 16-00073(A)-1<br><br>**DEFENDANT'S SENTENCING POSITION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; EXHIBITS**<br><br>Hearing Date: February 5, 2018<br>Hearing Time: 3:00 p.m.<br>Location: Courtroom of the Honorable Andrew J. Guilford |

Defendant, KAREN POGOSIAN, by and through the undersigned counsel of record, hereby submits the following sentencing position and accompanying memorandum of appoints and authorities in support of Mr. Pogosian's request that the Court find a variance from the Guidelines is warranted in this case resulting in a sentence of 2 years imprisonment, to be followed by a 3-year term of supervised release.

///

///

///

Dated: January 24, 2018

Respectfully Submitted,

/s/ *George G. Mgdesyan*

**GEORGE G. MGDESYAN**
*Attorney for Defendant*
KAREN POGOSIAN

GEORGE G. MGDESYAN (SBN 225476)
MGDESYAN LAW FIRM
15260 Ventura Boulevard, PH2200
Sherman Oaks, CA 91403
Tel: (818) 386-6777
Fax: (818) 754-6778
Email: George@attorneys4law.com

Attorney for Karen Pogosian

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>    vs.<br><br>KAREN POGOSIAN,<br><br>                    Defendant. | Case No.: CR 16-00073<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SENTENCING POSITION** |

I.

## INTRODUCTION

Defendant, KAREN POGOSIAN, by and through the undersigned counsel of record, hereby submits the following memorandum of points and authorities in support of his requested sentence.[1] The requested sentence would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

---

[1] Defense counsel contacted Government's counsel, AUSA Charles Pell, regarding the late filing of this memorandum. AUSA Pell indicated he does not object to the filing.

## II.

## **FACTUAL BACKGROUND**

The underlying criminal action is the result of the IRS and other law enforcement agencies nationwide investigation involving a tax fraud/money laundering scheme. The scheme involved over 7,000 false tax returns that together claimed approximately $38 million in refunds, of which approximately $14 million was deposited and laundered through bank accounts. The tax returns were filed using stolen identity information from thousands of victims.

Although the defense is unaware of the identities of the leaders and organizers of the sophisticated scheme, it obviously involved numerous individuals who were involved in its development and execution, including recruiting individuals such as the defendant, who would risk their freedom by exposing themselves. As part of the money laundering scheme, Mr. Pogosian was among a less culpable group of co-conspirators who were directed to unlawfully pose as others to rent mailboxes and open bank accounts in those other identities, using fraudulent identification documents and information.

As part of the scheme, Mr. Pogosian was directed to open mailbox and bank accounts using fraudulent identification with victim identities and information. When opening mailbox or bank accounts while posing in another person's identity, Mr. Pogosian would also use one fraudulent type of identification to obtain a second type of identification in the other person's name. For example, Mr. Pogosian used a foreign passport in the name of another person to obtain a Costco Member ship card also in the same person's name, but with Mr. Pogosian's photograph.

On September 25, 2017, Mr. Pogosian entered a guilty plea to Counts 2 and 21 of the 22-Count First Superseding Indictment which in which he is solely named.

Count 2 charges violations of 18 U.S.C. §§ 1344(2), 2(a), and 2(b): Bank Fraud and Attempted Bank Fraud, Aiding and Abetting, Causing an Act to be Done. From August 2012, and continuing until March 2014, Mr. Pogosian, together with others, executed a scheme to obtain money and other property from Bank of America, Union Bank, and Wells Fargo Bank by means of materially false and fraudulent representations and the concealment of material facts. Count 21 charges a violation of 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft.

Pursuant to a written plea agreement, the parties agree to the following: a base offense level of seven, pursuant to USSG § 2B1.1(a)(1); a twelve-level increase pursuant to USSG § 2B1.1(b)(1)(G); and a two-level increase pursuant to USSG § 2B1.1(b)(11)(c)(i). The parties reserved the right to argue for additional specific offense characteristics, adjustments, and departures. Additionally, the parties reserve the right to argue for a sentence outside the sentencing range pursuant to the relevant factors set forth in 18 U.S.C. § 3553.

The Government agreed to dismiss the remaining counts of the indictment as against Mr. Pogosian, to recommend up to a three-level downward adjustment pursuant to USSG § 3E1.1, and not to seek a sentence of imprisonment higher than the high end of the applicable Sentencing Guidelines range for Count 2, plus the mandatory minimum consecutive two-year sentence for Count 21.

On June 5, 2017, the United States Probation Department Officer (USPO) issued the Pre-Sentence Investigation Report (PSR) in this case and found a total Offense level

of 18, Criminal History Category II, for a guideline range of 54-61 months, plus an additional two-year mandatory consecutive term on Count 21. The USPO recommended a sentence of 54 months imprisonment.

III.

## ARGUMENT

### A. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Considering the nature and circumstances of the offense, although the offense is serious, when considered in conjunction with the garden variety of offenses with the same conduct as this case as discussed herein, it is minor in comparison in the loss calculation and the Defendants was not involved in development of the scheme, nor was did he play a managerial or aggravating role involving the means required to execute it. Rather, the Defendant was of the least culpable in this offense and was used by co-conspirators to execute the scheme.

### B. PERSONAL HISTORY AND CHARACTERISTICS

(1)    Family Ties and Responsibilities

Consideriung the personal history and characteristics, Mr. Pogosian was born in Armenia, and moved to the United States in 1995, at the age of 25. His parents live in the United States, and were living with him prior to his arrest. At the time of his arrest, he was the sole caregiver and provider for his parents.

Mr. Pogosian has been in a relationship with Mary Verdanyan since 2001. They have two children, a 13-year-old son, and a 12-year-old daughter. For the past five years, Pogosian, Mary, and their children have resided in Sun Valley, California. Similarly, Mr. Posogian was the sole provider for his family. Based on letters to the Court on behalf of

his friends and family, Mr. Pogosian appears to have been an honest and hard working individual, devoted to family and the church.

Mary Vardanyan describes Mr. Pogosian as:

"very kind, modest, friendly and educated person. He has been with me in my good and bad days. I love him very much. We have lived together very friendly and peacefully. I can talk endlessly about him being kind and honest. He always tried to make everyone happy and make surprises. Although he has had health issues, but never showed them. For that reason he was often going to hospital lately, and I have always been with him all that time, done all I possibly could. He has always been a loved father by his children. I appreciate him as a father of my kids, as my boyfriend and the kind of person he is. He has always helped me at home with shopping and never made me do that myself. He has been very dedicated and unselfish father and boyfriend. I love and miss him very much and pray daily for him to be back home reunited with all of us."

Mr. Pogosian's mother describes his childhood, family, and medical condition"

"Karen had a very joyous and happy childhood, did very well in school, going for higher education after graduating from High School. He was good at Mathematics and Drawing. He completed the Polytechnic Institute with high grades. He has family with 2 lovely kids, a son - Armen, and a daughter — Joulieta, and girlfriend Mary Vardanyan. He loves his family always paying his full attention, giving good advices and supporting with everything he can. He is an exemplary father, well respected by his friends, family, relatives and coworkers. I am very worried for my son's health issues, wish him a very speedy recovery and the earliest homecoming to his family where he is much loved."

Armen Pogosian, Mr. Pogosian's son describes him as an intelligent and giving individual, who taught him the differences between right and wrong and not to make the same mistake twice:

"my dad he is the most generous person you will ever meet he is not only generous but he is very caring. My dad to me was like a brother then more of a father we would go everywhere like to parks and various other places. Every night I pray that he comes home soon and that I can be reunited with him again. He taught me very valuable things like do not take things for granted and that everything happens for a reason. We also had a lot in common like the genre of music we listen to. He also is admired for his generosity and his hospitality towards others and his intelligence. He is also very persistent in what he sets his mind to do. He is also the type of person that if he wants something done then he will go and do it himself. He is also a very intelligent he knows about everything you can ask him

about anything you need whether it be about help with like math or just anything he had some type of knowledge in each category. but my dad he does not what he does is he says that think of the mistake you just made and try to correct yourself so it does not happen next time and from my mistake I would .learn a lesson and not do it again. He always helped me with everything I have needed that would be for all subjects. We both like the same things whether that .would be cars and music. My dad to me is more of a brother because we like the same things and we have the same personality. I want to be generous and intelligent like him because I admire his intelligence and knowledge in every subject and his generosity. I am very grateful for the father I have because he is nice to us because he has taken us where we have liked to went. If anyone needed help in anything whether it would be like for example homework or like .help with anything else, he would always help them because he had some type of knowing in every subject. I pray every night that he comes home one day and he comes home healthy and ready to live a normal life."

Emperical research and Commission studies show that recidivism rates are lower for defendants who are or were ever married, even if divorced. See USSC, Measuring Recidivism, supra note 134, at  11. Other studies show that supportive family connections predict reduced recidivism,[2] while breaking up families leads to increased recidivism.[3]

In 2003, a majority of district court judges indicated in a survey that more emphasis was needed on family ties and responsibilities. See Linda Drazga Maxfield, Office of Policy Analysis, USSC, Final Report: Survey of Article III Judges on the

---

[2]   Kimberly Bahna, "It's a Family Affair" – The Incarceration of the American Family: _Confronting Legal and Social Issues_, 28 U.S.F. L. Rev. 271, 285 (1994) (prisoners who have supportive families are less likely to recidivate); **_Shirley R. Klein et al., Inmate Family Functioning_**, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures.").

[3]   The Sentencing Project, Incarceration and Crime: A Complex Relationship 7-8 (2005) ("The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality.").

Federal Sentencing Guidelines, Chapter II (Mar. 2003), available at www.ussc.gov. It was in the same year that survey was issued, however, that Congress enacted the PROTECT Act and the Commission amended § 5H1.6 to make the departure provision governing family ties and circumstances more restrictive.

Since Booker was decided, there has been a marked shift away from departure analysis for considering family ties and responsibilities, with courts increasingly relying on Booker and 18 U.S.C. § 3553(a) to avoid the restrictions in § 5H1.6 relating to family ties and responsibilities. In 2003, for example, courts cited family ties and responsibilities 430 times as a reason for downward departure, or in 8.8% of cases in which a nongovernment-sponsored downward departure was granted.

By fiscal year 2008, courts cited family ties and responsibilities as a reason for a departure in only 182 cases in which a downward departure was granted, or just under 2% of all cases in which sentence below the guidelines was imposed. However, free of the constraints of strict departure analysis, courts cited family ties and responsibilities as a reason for sentencing below the guideline range in cases in which a sentence below the guideline was imposed under Booker and 18 U.S.C. § 3553(a) in another 883 cases, almost five times as many cases, for a total rate of 11.7% of all cases in which a below-guideline sentence was imposed.

The Third Circuit sitting en banc affirmed a below-guideline sentence of probation, community service, restitution, and fine on a conviction for tax evasion, which was based in part on the defendant's community ties. ***United States v. Tomko***, 562 F.3d 558, 571 (3d Cir. 2009) (en banc) ("This variance took into account his negligible criminal history, his employment record, his community ties, and his extensive charitable

works as reasons for not incarcerating" the defendant, "while also factoring in his substantial wealth as a reason for imposing a fine far above the Guidelines."). In the Commission's recent survey of judges, 62% said that family ties and responsibilities is "ordinarily relevant" to the consideration of a departure or variance. See USSC, 2010 Survey of Judges, supra note 1, at tbl.

       (2)      **Criminal History**

      Departures based on criminal history became a common feature of guideline practice, and by 2003, criminal history was cited as a reason for downward departure in 1,079 cases, representing 22% of all cases in which a non-government initiated downward departure was granted. See 2003 Sourcebook, tbl. 25A. As part of its work on reducing the rate of departures in response to section 401(m) of the PROTECT Act directing the Commission to reduce the rate of departures, the Commission amended § 5H1.8 in 2003 to specify that the only grounds for departure based on criminal history are set forth in § 4A1.3. See USSG, App. C, Amend. 651 (Oct. 27, 2003).

      The Commission has published three reports on recidivism, acknowledging that the criminal history rules were never based on empirical evidence. 8 See USSC, Measuring Recidivism, supra note 134; USSC, First Offender, supra note 134; USSC, Salient Factor Score, supra note 134. Moreover, although the Commission based its criminal history rules in large part on the Parole Commission's Salient Factor Score (SFS), the Commission's various deviations from the SFS (not based on empirical evidence) resulted in a Criminal History Category that is a worse predictor of recidivism than the Parole Commission's SFS. USSC, Salient Factor Score, supra note 134, at 12. For example, the predictive power of USSG § 4A1.1(f), which adds one point for a prior

crime of violence that was not counted under § 4A1.2 because it was found to be "related to" another crime of violence, is statistically insignificant.[4]

Despite the Commission has also found that the inclusion of non-moving traffic violations in the criminal history score may adversely affect minorities "without clearly advancing a purpose of sentencing" (regardless of the defendant's race) and "there are many other" such possibilities. USSC, Fifteen Year Review, supra note 98, at 134. Many courts and commentators have recognized, and many studies have shown, that African Americans are stopped by the police and charged only with traffic offenses in disproportionate numbers, often called "driving while black."331 The same Commission research showing that recency points under § 4A1.1(e) "only minimally improves" the ability of the criminal history score to predict recidivism, see USSG, App. C, Amend. 742 (Nov.1, 2010), appears to show the same thing for status points under § 4A1.1(d). See Testimony of Margy Meyers and Marianne Mariano Before the U.S. Sentencing Comm'n, at 90 (Mar. 17, 2010), supra note 136, at 90-93.

Despite § 5H1.8, criminal history issues now represent the most often cited reason for imposing a sentence below the advisory guideline range. In fiscal year 2010, criminal history issues were cited in a whopping 91% of cases in which a downward

---

[4]    30 Id., at 7, 11, 15. It should be noted that the concept of "related cases" in § 4A1.2 was replaced in 2006 by the concept of a "single sentence." See USSG § 4A1.2(a) (2008). The effect of this change on the Commission's recidivism data is not known. As a result, it remains fair to say that the extra point under § 4A1.1(f) has no known empirical basis.

departure was granted, by far the reason cited most often for a downward departure. See USSC, 2010 Sourcebook of Federal Sentencing Statistics, tbl. 25 (2010) (representing 43.8% of all reasons given for a downward departure).332 At the same time, criminal history issues were cited in 61% of cases in which the court granted a downward departure with Booker and § 3553(a), and in 16.4% of cases in which the court granted a variance. See id. tbls. 25A & 25B. Taken together, courts cited criminal history issues as a reason for imposing a below-guideline sentence in approximately 28.5% of all cases in which a below-guideline sentence was imposed. Unfortunately, the Commission does not further break down its data to show which criminal history rules most often lead judges to sentence below the guidelines. But these general data, in the form of feedback from the courts, should signal to the Commission that its criminal history rules do not further the purposes of sentencing and need attention. It is interesting to note that the overall rate of below guideline sentences based in whole or in part on criminal history issues increased by 1% from fiscal year 2009, even after recency points were eliminated

In this case, Mr. Pogosian has absolutely no criminal history, with the exception of a misdemeanor offense for driving under the influence, which he sustained in 2008. Mr. Pogosian was assigned a single criminal history point for the underlying conviction and because his probation for that offense had not expired at the time the underlying offense had occurred, he was assigned an additional 2 points under the guidelines. Because Mr. Pogosian had 3 criminal history points, he was designated a Lever II Offender, despite his complete lack of any criminal history. Under such circumstances, a variance in his sentence is warranted.

(3)      **Medical Condition**

Considering the aforementioned facts, it is hard to discern any reason or motive for Mr. Pogosian to become involved in the instant offense, However, a closer look at Mr. Pogosian medical history may provide at least a an explanation.

Several years before his involvement in the underlying offense, Mr. Pogosian's medical conditions began and worsened to a severe case of diabetes. Currently Mr. Pogosian is insulin dependent. He also suffers from high blood pressure, high cholesterol, back pain, and asthma. Because of his medical condition, Mr. Pogosian is was and remains unable to work and has been on public assistance since 2007. After years of surviving on the minimal income puclic assistance provides, his household needs were overwhelming and he was unable to afford even the bare necessities. When presented with the opportunity of having additional income, he fell for the temptation.     If     the Court were to consider his worsening medical condition as contributing to the offense, it would be clear that the crime was not out of  "greed or a desire to live a lavish lifestyle," *as it is in the mine-run fraud case*.[5]  There is no doubt that Mr. Pogosian violated the law and he  not only  deeply regrets his errors in judgment, but accepts full responsibility for the mistakes he has made.

---

[5]    *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Milne*, 384 F.Supp.2d 1309, 1310-11 (E.D. Wis. 2005)(granting variance where defendant did not take the bank's money "out of greed or a desire to live a lavish lifestyle, [but in an effort] to keep a sinking business afloat"); *United States v. Gerard*, 782 F.Supp.2d 913, 915 (S.D.N.Y.1992)("financial desperation . . . lends explanation, though not excuse, to the activities for which [the defendant] is now being sentenced") (imposing sentence of five years probation, notwithstanding Guidelines range of 33 to 41months).

13

While the plea agreement and Guidelines take into consideration that the offense involved monetary loss, the resulting guideline range clearly over represents the seriousness of the offense when considered with the factorsd described herein. While insufficient for departure purposes, it is clearly relevant in determining whether the Court should find a variance under Section 3553. *United States v. McBride*, 362 F.3d 360, 376 (6th Cir. 2004) (in bad check and bankruptcy scam, remanded for district court to consider whether to depart downward under § 2B1.1 where intended loss of over $1 million "substantially overstated" actual loss of $800); *United States v. Thurston*, 456 F.3d 211, 219 (1st Cir. 2006) (remand for re-sentencing because district court departed too much, court observed that "a sentencing court plausibly could conclude that a $5,000,0000 intended loss finding, with its resultant 14-level increase in the offense level, leads to a modest overstatement of the seriousness of Thurston's crime"); *United States v. Walters*, 87 F.3d 663, 672 (5th Cir. 1996) (in money laundering case, district court reasonably departed downward by six months where Defendant did not personally benefit from the fraud; lack of benefit was not considered by the guidelines; so §5K2.0 authorizes departure).

Based on all of these factors described above, additional imprisonment beyond the 24 month consecutive sentence required would be far greater than necessary to achieve the statutory sentencing objectives. As such, a substantial variance is warranted in this case.

C. <u>**THE NEED FOR THE SENTENCE IMPOSED TO BE SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE SENTENCE OBJECTIVES**</u>

To address the questions of a just punishment and deterrence, the empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime.  The Sentencing Commission has found that "[t]here is no correlation between recidivism and Guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism." U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004). And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,91 Prison J. 48S, 50S-51S (2011).

Research  regarding white-collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. See David Weisburd, et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Also relevant to the issue of sentencing is the fact that Mr. Pogosian has never been to prison prior to this offense. See _United States v. Collington_, 461 F.3d 805 (6th Cir. 2006) (upholding sentence of 120 months where guideline range was 188 -235 months in part because guidelines did not reflect defendant's actual criminal history, that

he had only previously served 7 months in prison before the offenses and was an ideal candidate for reform, and that "this incident was the first time that this quantity of drugs and guns had been found in [his] possession"); _United States v. Baker_, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence of 78 months from 108 months for defendant convicted of distributing child porn, justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with the goals of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B).) [6]

---

[6]      _Gall v. U.S._, 128 S. Ct. 586, 592, 599 (2007) (see discussion in Introduction above concerning defendant's employment history and the start of his own business); _U.S. v. Baker_, 445 F.3d 987, 992 (7th Cir. 2006)(affirming sentence of 78 months for distributing child pornography, where guidelines called for 108-135 months, based on defendant's lack of criminal history, relatively young age, religious background, and history of employment and higher education which coincide with sentencing factors set forth in § 3553(a); _U.S. v. Chase_, 560 F.3d 828 (8th Cir. 2009)(defendant's excellent employment record could support downward the variance); _U.S. v. Big Crow_, 898 F.2d 1326, 1331-32 (8th Cir. 1990) (upholding downward departure for 23 year old defendant convicted of assault resulting in serious bodily injury, based on excellent employment record since age 17 despite an unemployment rate of 72% on Indian reservation and defendant's efforts to lead a decent life on the reservation); _United States v. Whitehead_, 532 F.3d 991 (9th Cir. 2008)(upholding probation where guidelines range was 41-51 months for creating counterfeit access device where district court had found that defendant was remorseful, was employed, supported his daughter and no longer posed a threat to community);_United States v. Munoz-Nava_, 524 F.3d 1137 (10th Cir. 2008)(upheld sentence of one year and one day as reasonable for defendant convicted of possession with intent to distribute 100 grams of heroin with guideline range of 46-57 months where district court determined guideline range was greater than necessary to meet goals of 3553(a)(2) and focused on his personal history and characteristics, including defendant's long work record, community support, lack of criminal record, and caregiver and sole supporter of his young son and elderly parents, and low recidivism risk); _U.S. v. Jones_, 158 F.3d 492 (10th Cir. 1998)(3-level downward departure affirmed for defendant convicted of possessing firearm by prohibited person where court considered defendant's "long impressive work history ...where good jobs are scarce" along with other factors_); U.S. v. Lamb_, 214 F. App'x 908 (11th Cir. 2007)(affirming 181 months for drug and firearm offenses despite guidelines minimum of 420 months, in light of defendant's employment at Humane Society and youth when he committed crimes that triggered career offender status); _U.S. v. Hodges_, 2009 WL 366231 (E.D. N.Y., Feb. 12, 2009)(non-guideline sentence proper for 43-year-old defendant who suffered from heroin addiction, yet who established his own company after serving ten year

When coupled with the three-year term of supervised release requested herein, the requested sentence will have served as serve as an adequate deterrent.  Beyond the extensive limits on a supervisee's freedom, yet another punishment inherent is the proverbial hangman's noose. At any slip or violation of supervision conditions, the noose can be tightened and the offender imprisoned. The Ninth Circuit used this very metaphor when it upheld an Oregon district court's imposing probation rather than imprisonment in a child pornography case:

> It is said that there is nothing like being sentenced to hang in the morning to focus a man's thoughts, and it is improbable that the district court's stern warning will be an ineffective deterrent in this case.

*Autery*, 555 F.3d 864, 876 (9th Cir. 2009).

Supervised release, then, is not just a momentary loss of freedoms—it entails an overhanging and continuing threat of greater losses. Trial courts have the inherent power to tighten the noose by extending the period, or exacting harsher conditions, requiring home confinement, or requiring the defendant to serve prison time. Thus, the threat of imprisonment is a deterrent factor: "Deterrence involves the prevention of criminal acts by the threat of punishment, which is addressed to the aversion to being punished." Richard G. Board, Operational Criteria for Determining Criminal Responsibility, 61 Colum. L. Rev. 221 (1961). This Court's supervisory power over Mr. Pogosian

---

sentence for a non-violent offense and supported his family for another ten years until his relapse into drug abuse led to the collapse of his business); *U.S. v. Collado*, 2008 WL 2329275 (S.D.N.Y. 2008)(court imposed time served on felon-in-possession of ammo defendant had found in a used van he bought for his new moving business, and facts bore out his claim of turning his life around since his release from prison three years earlier, working many jobs and starting his own company with a law-abiding, devoted girlfriend).

following and in conjunction with prison time he is sentenced to will serve as a sufficiently effective deterrent.

### 1. <u>To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.</u>

The need for retribution is measured by the degree of "blameworthiness," which is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused by the crime; and the offender's degree of culpability in committing the crime, in particular, his "degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (Feb. 2005).[7]

Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to

be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984)(set forth at 18 U.S.C. § 3551).

Defendant herein is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society."[8] To the contrary, he wishes to return to life as productive member of society "in the most effective manner." While not a first time he clearly acted out of character and the nature of his prior misdemeanor offenses is clearly minor.[9] In short, a variance from the Guidelines is needed to avoid its restrictive policies on these issues.

In determining the proper sentence to promote respect for the law, the Supreme Court explained that sentencing courts may consider sentences imposed on similarly situated defendants:

---

[8]   In *United States v. Whitehead*, 532 F.3d 991 (9th Cir.2008) (*per curiam*), the Ninth Circuit affirmed a probationary sentence despite the guideline range of 41-57 months for creating counterfeit access devices; explaining that the district court had "properly take[n] into account" its "findingthat Whitehead's [nonviolent] crime '[di]d not pose the same danger to the community as many other crimes.'" *Id.* at 993.

[9]   *See United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) (affirming non-guideline sentence of 78 months from 108 months for defendant convicted of distributing child porn, justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with goal of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B); *United States v. Cull*, 446 F.Supp.2d 961, 965 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, where advisory range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending); *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration).

"The Government's legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law is at least to some extent offset by the fact that seven of the eight defendants in this case have been sentenced to significant prison terms. Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

*Gall v. United States,* 552 U.S. at 54 (citations omitted).

In the instant matter, although Defendant pled guilty to a serious offense, a close look at the underlying facts and circumstances previously stated clearly indicate that a sentence on imprisonment would be but a derision of the law as a means to dispense harsh punishment without taking into account the real conduct and circumstances of the offense.

### (2) Sufficient to Afford Adequate Deterrence to Criminal Conduct

The Supreme Court has recognized that the likelihood a defendant will engage in future criminal conduct is a central factor that district courts must assess when considering an appropriate sentence. *Pepper v. United States*, 131 S.Ct. 1229, 1242 (2011), *citing*, 18 U.S.C. §§ 3553(a)(2)(B)-(C); *Gall v. United States*, 552 U.S. 38, 59, 128 S.Ct. 586 (2007). Similarly, the Eleventh Circuit has also evaluated a defendant's risk of recidivism "as a basis for a sentencing departure." *See United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011).

20

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime.[10] The Sentencing Commission has found that "[t]here is no correlation between recidivism and Guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004)(hereinafter "*Measuring Recidivism*"). And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011).

The sentence requested herein serves as a serious and real deterrent. Beyond the extensive limits of probation and community confinement placed on Mr. Pogosian's freedom, yet another punishment inherent in the requested sentence is the proverbial hangman's noose. At any slip or violation of community confinement and probation, the

---

[10]    *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

noose can be tightened and the offender imprisoned. The Ninth Circuit used this very metaphor when it upheld a probationary sentence rather than imprisonment in a child pornography case:

> It is said that there is nothing like being sentenced to hang in the morning to focus a man's thoughts, and it is improbable that the district court's stern warning will be an ineffective deterrent in this case.

_United States v. Autery_, 555 F.3d 864, 876 (9th Cir. 2009).

Community confinement and the accompanying term of probation, then, is not just a momentary loss of freedoms—it entails an overhanging and continuing threat of greater losses. Trial courts have the inherent power to tighten the noose by extending the period of probation, or exacting harsher conditions, or requiring the defendant serve prison time. Thus, the ongoing threat of imprisonment is a deterrent factor: "Deterrence involves the prevention of criminal acts by the threat of punishment, which is addressed to the aversion to being punished." Richard G. Board, _Operationa lCriteria for Determining Criminal Responsibility_, 61 Colum.L.Rev. 221 (1961). Imposition of the requested sentence and this Court's supervisory power over him will serve as a sufficiently effective deterrent, particularly since he is essentially a first time offender whom has never been to prison.[11]

---

[11]     _U.S. v. Baker_, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence of 78 months from 108 months for defendant convicted of distributing child porn, justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with goal of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B); see also _U.S. v. Paul_, 239 F.App'x 353 (9th Cir. 2007) (defendant's 16-month sentence, the top end of the guideline range for unlawful receipt of federal funding, was unreasonably high because defendant was a first-time offender, returned the funds, and displayed remorse); _U.S. v. Jewell_, 2009 WL 1010877 (E.D.Ark. April 15, 2009) (defendant sentenced to 30 months in prison for aiding and abetting tax evasion, because guideline range near the statutory maximum of 5 years was inappropriate for first time

**3.     To Protect the Public from Further Crimes of the Defendant**

Based on the above, imposing a substantial and/or any significant prison term in this instance would not serve to protect the public, only unnecessarily cost it.[12]

**4.     To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

An audit by the Office of the Inspector General has found systemic deficiencies in the Bureau of Prisons' delivery of health services. It found that at a number of institutions, the Bureau of Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions, including diabetes and heart conditions. *See* U.S. Dept. of Justice, Office of the Inspector General

---

offender); *U.S. v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, where advisory range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending); *U.S. v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration).

[12]     *U.S. v. Chavez*, 230 F.3d 1089 (8th Cir. 2000) (Bright, J., concurring) (sentence will probably cost taxpayers $836,000, and the defendant his life; guidelines range for nonviolent offenders drains billions from taxpayers and keeps potentially productive members of society locked up, causing staggering "opportunity costs"); U.S. v. Angelos, 345 F. Supp. 2d 1227 (D. Utah 2004) (cost of mandatory 61-year-sentence runs to $1,265,000, money that could otherwise be spent on other law enforcement or social programs to reduce crime) U.S. v. Hughes, 825 F. Supp. 866 (D.Minn.1993) (same, the court noting that "the non-rehabilitation purposes of incarceration-retribution, deterrence and incapacitation-would all be more than adequately served by a far shorter sentence. Both society and the defendant will pay a dear cost for this sentence and receive very little in return.")

AuditDivision, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care,*ii-xix,32-34 (2008).[13]

The Commission now recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted," and has always recognized that "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4. In the Commission's survey of district judges, 64% stated that physical condition is "ordinarily relevant" to the consideration of a departure or variance. U.S.S.C., *2010 Survey of District Judges*, *supra*, at Tbl. 13. Thus, Mr. Pogosian's medical condition should also enter into the sentencing consideration.[14]

Senior District Judge Kane, in the District of Colorado, engaged in a balancing process to sentence a defendant with chronic medical conditions to one day in prison and lifetime supervised release in a child pornography case where the advisory guideline range was 97 to 120 months' imprisonment. *United States v. Rausch*, 570 F. Supp. 2d 1295, 1305 (D. Colo.2008). Judge Kane found that Mr. Rausch's "extremely poor health and the complexity of his needs for medical care," which the government had not shown BOP

[13]*Available at* www.justice.gov/oig/reports/BOP/a0808/final.pdf.

[14]*See United States v. Harris*, 567 F.3d 846, 854-55 (7th Cir. 2009) (district court erred in failing to consider defendant's significant health problems under § 3553(a) despite policy statement requiring "extraordinary" impairment); *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008) (three years probation imposed for conspiracy to distribute cocaine rather than 60 month guideline term, based on serious health problems, including anxiety, depression, nervous disorders and heart disease, as well as his post-arrest rehabilitation); *United States v. Spigner,* 416 F.3d 708, 711 (8th Cir. 2005) (although defendant who sold more than 50 grams of crack had agreed not to ask for downward departures based on health, case was remanded because district court could still impose a sentence lower than the suggested range and §3553(a)(2)(D) required court to consider the need to provide medical care in the most effective manner).

24

could or would meet in the most effective manner, "overrides any value that further imprisonment would have." *Id.* at 1308. He concluded that the sentence imposed was the "strongest penalty I can exact without putting [the defendant's] life at substantial risk." *Id.* Judge Kane recognized that while the BOP may in theory be able to provide needed medical services in reality it may not be able to do so "in the most effective manner" and that, as a result, a term of imprisonment would be too severe.[15]

Furthermore, persons with serious or chronic medical conditions housed at a federal medical center often serve their prison terms many thousands of miles away from family members. Studies show that supportive family connections predict reduced recidivism,[16] while breaking up families leads to increased recidivism.[17]

**D.** **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who have been Found Guilty of Similar Conduct**

---

[15]*See also United States v. Garcia-Lopez*, 691 F.Supp.2d 1099, 1100-01, 1105 (C.D.Cal. 2010) (where the Guidelines "advise a range of 41 to 51 months imprisonment," the District Court instead "impose[d] a custodial sentence of six months deemed time served," based in part upon the fact that the defendant "suffers from a serious medical condition").

[16]*See* Kimberly Bahna*, "It's a Family Affair" – The Incarceration of the American Family: Confronting Legal and Social Issues*, 28 U.S.F. L. Rev. 271, 285 (1994) (prisoners who have supportive families are less likely to recidivate); Shirley R. Klein *et al.*, *Inmate Family Functioning*, Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures.").

[17] The Sentencing Project, *Incarceration and Crime: A Complex Relationship* 7-8 (2005) ("The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality."), *available at* http://www.sentencingproject.org/doc/publications/inc_iandc_complex.pdf.

Since the offense is a Class C felony, the Defendant is eligible for probation of not less than 1 year and no more than 5 years. 18 U.S.C. 3571(b). The first fraud guideline, § 2F1.1, included two specific offense characteristics in addition to loss, one with four subparts applicable in the alternative and one that required a floor of 12 levels. See U.S.S.G. § 2F1.1 (1987). Today, § 2Bl.l includes eighteen (18) cumulative specific offense characteristics, many with multiple alternatives. See U.S.S.G. § 2B1.1 (2012). In the initial set of Guidelines, if there was "more than minimal planning" and "more than one victim," only one 2-1evel enhancement applied.

Since the Commission has not corrected the problem of multiple overlapping enhancements, many courts have recognized that a departure or variance is necessary to avoid it. See, e.g., _United States v. Lauersen_, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of Booker)(upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); _United States v. Parris_, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (Guidelines in security fraud cases "are patently absurd on their face" due to the "piling on of points" under § 2B1.1); _United States v. Adelson_, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (Guidelines in fraud cases have "so run amok that they are patently absurd on their face," and describing enhancement for "250 victims or more," along with others, as "represent[ing], instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized").

In fiscal year 2012, sentences below the guideline ranges nationwide were imposed in 47.5% of all fraud cases, increased consistently since Booker.[18] In 2012, more significantly, the Court in the Central District of California sentenced under the fraud guideline to within or above the Guidelines range in only 43.8% of the cases. Id. at 18, Tbl. 10. Thus, it would appear that a sentence within the proscribed range under the fraud guideline, at least in this District, would cause a sentencing disparity.

The Sentencing Commission continues to ignore the fact that judges are increasingly imposing below Guidelines sentences in fraud cases. Only one reasonable conclusion can be drawn by these statistics: the fraud guideline, under § 2B1.1, produces sentences greater than necessary to achieve the purposes of sentencing pursuant to Section 3553(a). This Honorable Court is empowered under the Supreme Court's Booker-line of cases to disagree with the fraud guideline. A significant variance is necessary to do justice in this case, and will also contribute to the evolution of responsible Guidelines. As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw." _Rita v. United States_, 551 U.S. 338, 357-58 (2007).

As this Court is aware, several Defendants in this case have already been sentenced by this Court:

---

[18]    See U.S.S.C., 2012 Sourcebook of Federal Sentencing Statistics: Sentences Relative To The Guideline Range By Each Primary Offense Category.

27

1. Konstantin Galstyan (CR 16- 00056-AG): Sentenced to 21 months BOP and 5 years of supervised release; Mr. Galstyan's loss amount was $440,350.

2. Artash Stepanyan: (CR 16-00063-AG): Sentenced to 19 months BOP and 3 years supervised release.  Mr. Stepanyan's loss amount was approximately $1,091,552.

3. Sergio Tabadzhyan (CR 16-00064-AG): Sentenced to 30 months BOP and 3 years supervised release; with a loss amount of $511,000.00.

4. Eduard Astvatsatryan (CR 16-00066-AG) Sentenced to 31 months BOP and 3 years supervised release; Mr. Astvatsatryan used nine identities.

5. Arman Khachkalyan (CR 16-00070-AG) Sentenced to time served and three years supervised release.

6. Arman Galstyan (CR 16-00071-AG) Sentenced to 21 months BOP and three years supervised release with a loss amount of $362,000.00.

Here, Mr. Pogosian's loss amount is $254,000[19] which is far less than defendant Stepanyan who was sentenced to 19 months with a loss amount approximated at $1,091,552 or Mr. Konstantin Galstyan who was sentenced to 22 months for a loss amount close to $440,350. Further, although Mr. Pogosian pleaded guilty to count 21, 18 U.S.C. Section 1028A(a)(1), the conduct constituting this violation was not different from the conduct of the other defendants in the related cases, *infra*. As such, the sentence to be imposed as to count 2, 18 U.S.C. Section 1344(2) should run concurrent to the sentence to be imposed as to count 21.

---

[19] After additional discovery, the amount has been updated to $277,617.

IV.

**CONCLUSION**

Given his personal history and characteristics, the circumstances of the offense, and his substantial post-offense rehabilitation, it is Mr. Pogosian's hope that the Court will find that the goals of §3553(a)(2) are met with a sentence that omits any further incarceration. Surely such a sentence is "sufficient but not greater than necessary to comply with" those goals.

Dated: January 24, 2018

Respectfully Submitted,

/s/ *George G. Mgdesyan*

**GEORGE G. MGDESYAN**
*Attorney for Defendant*
KAREN POGOSIAN